# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### October 5, 2004 Session

## JON HALL v. STATE OF TENNESSEE

### Direct Appeal from the Circuit Court for Madison County
#### No. C00-422          Roy B. Morgan, Judge

---

### No. W2003-00669-CCA-R3-PD  - Filed January 5, 2005

---

The petitioner, Jon Hall, appeals as of right the judgment of the Madison County Circuit Court denying his petition for post-conviction relief from his capital murder conviction. The petitioner was convicted of the 1994 first degree murder of his estranged wife, Billie Jo Hall. At the conclusion of the penalty phase of the trial, the jury found one aggravating circumstance that the murder was especially heinous, atrocious and cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. See T.C.A. § 39-13-204(i)(5). The jury further found that the aggravating circumstance outweighed the evidence of mitigating circumstances beyond a reasonable doubt and sentenced the petitioner to death. The petitioner's conviction and sentence of death were affirmed on appeal. See State v. Hall, 8 S.W.3d 593 (Tenn. 1999), reh'g denied, (Dec. 27, 1999), cert. denied, 531 U.S. 837 (2000). The petitioner filed a pro se petition for post-conviction relief on December 7, 2000, which was followed by an amended petition on November 1, 2001. On February 20, 2003, the trial court denied relief and dismissed the petition. The petitioner appeals, claiming that: (1) counsel were ineffective at the guilt phase; (2) counsel were ineffective at the penalty phase; (3) the heinous, atrocious or cruel aggravating circumstance is unconstitutional as applied in this case; (4) the imposition of the death penalty is unreliable and violates principles protected by both the United States and Tennessee Constitutions; and (5) the death sentence is unconstitutional as it infringes upon the petitioner's right to life and is not necessary to promote any compelling state interest. We conclude that no error of law requires reversal, and we affirm the trial court's denial of post-conviction relief.

#### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID G. HAYES and JAMES CURWOOD WITT, JR., JJ., joined.

Paul N. Buchanan, Brentwood, Tennessee, and Danny R. Ellis, Jackson, Tennessee, for the appellant, Jon Hall.

Paul G. Summers, Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; James G. Woodall, District Attorney General; and Alfred Lynn Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Background

The following facts were developed at the petitioner's trial and noted by the supreme court in the direct appeal. See Hall, 8 S.W.3d at 596-99. The petitioner and the victim were married, and the victim had two daughters, Jennifer and Cynthia, from a previous relationship of the victim. The couple had two more daughters, Stephanie and Jessica. The youngest, Jessica, suffered from cerebral palsy. In 1994, the victim and the petitioner began having marital problems and were living separately.

On the night of July 29, 1994, the petitioner went to the victim's house to discuss a reconciliation. He brought a $25.00 money order made out to the victim as a payment toward child support. Prior to entering the house, the petitioner disconnected the telephone line at the utility box on the outside wall of the house. When the victim answered the door, the petitioner pushed his way into the room where she and the children were watching television. The petitioner told the girls to go to bed. When they did not immediately obey his order, the petitioner tipped over the chair in which the victim was sitting. The petitioner and the victim went back into her bedroom. The children, who had gone into their bedrooms, could hear "[t]hings slamming around" and their parents yelling at each another. When the children tried to enter the room, they found the door blocked. The three oldest children, Jennifer, Cynthia and Stephanie, persisted in their efforts to get into the room and finally succeeded. They attempted to stop the petitioner from hurting their mother. Cynthia jumped on the petitioner's back and bit him. This did not stop the petitioner's attack. When the victim told the children to go to a neighbor's house, the petitioner told them that if they went for help, "he was going to kill Mama." He also told the victim, a college student, that she would never live to graduate. Cynthia and Stephanie tried to use the telephone to call for help, but they discovered the telephones would not work. At that point, they went to a neighbor's house where they called 9-1-1. Jennifer, the oldest child, was the last to leave the house, carrying her sister Jessica. Before she left, she saw her mother and the petitioner leave the bedroom and go outside. She watched the petitioner drag her mother, "kicking and screaming," to the small pool in the back yard.

The first officer to arrive on the scene was Chief Jerry Bingham of the Henderson County Sheriff's Department. Upon his arrival, he found the victim's body floating face down in the water. He immediately called Emergency Medical Services and a Tennessee Bureau of Investigation (TBI) investigator. TBI Agent Brian Byrd arrived on the scene shortly after midnight.

Agent Byrd entered the house and found the master bedroom in disarray. Bloodstains marked the bed, a counter top, and a wedding dress. The telephones inside the house were off their hooks.

2

A $25.00 money order made out to the victim and dated the day of the murder was found inside the house. No weapons were found. A trail of drag marks and bloodstains led from the master bedroom, out the front door, over the driveway, past the sandbox, and down to the pool in the back yard. The victim's t-shirt was lying beside the pool. Clumps of grass ripped from the ground floated in the blood-tinged water of the pool. Outside the front door of the house the telephone junction box was opened, and the telephone line was disconnected. The grass and weeds near this box were matted down.

Dr. O'Brien Clay Smith, the forensic pathologist who performed the autopsy, testified that the primary cause of death was asphyxia resulting from a combination of manual strangulation and drowning. He could not say with certainty that either strangulation or drowning was the exclusive cause of death. Evidence supporting strangling as a contributing cause of death included bruising on the left and right sides of the victim's neck, hemorrhaging in the neck muscles around the hyoid bone in the neck, and bleeding in the thyroid gland, which indicated that extensive compression had been applied to the neck. Evidence supporting drowning as a contributing cause of death was water found in both the victim's stomach and in her bloodstream.

Before dying, the victim sustained at least eighty-three separate wounds, including several blows to the head, a fractured nose, multiple lacerations, and bruises and abrasions to the chest, abdomen, genitals, arms, legs and back. Abrasions on the victim's back were consistent with having been dragged across pavement. Dr. Smith described some of the injuries to the victim's arms, legs and hands as defensive wounds. He characterized the injuries to the neck, face and head as intentional "target" wounds. Except for the physical trauma associated with the strangulation, however, none of the injuries would have proven fatal.

Chris Dutton, who was confined in a cell next to the petitioner, testified that while both men were incarcerated, the petitioner confided in him about his wife's murder. When describing what happened on the night of the murder, the petitioner told Dutton that he had tried to talk with the victim about reconciling but "[a]ll she was interested in was the money." When she refused to consider his plea for reconciliation and demanded that he leave, "his temper got the best of him and he began to strike her." According to Dutton, the petitioner had determined, even before he arrived at his wife's house, "to make her feel as he did. He wanted her to suffer as he did, feel the helplessness that he was feeling because she took his world away from him." The petitioner told Dutton that he hit his wife in the head until he panicked, threw her in the swimming pool, then re-entered the house, took the car keys, and drove away in the victim's minivan.

On cross-examination, Dutton admitted that the petitioner told him that he was depressed and had been drinking since he telephoned his wife earlier that day. The petitioner also told Dutton that he was very concerned about the welfare of his two daughters, especially Jessica. The petitioner explained that he disconnected the telephone line because when he and his wife argued in the past, she had called the police.

3

Two witnesses testified on the petitioner's behalf during the guilt phase of trial. Dr. Lynn Donna Zager, a clinical psychologist, interviewed the petitioner several times after his arrest. She diagnosed him as depressed and suffering from alcohol dependence. In addition, she noted personality characteristics of paranoia and dependency. In Dr. Zager's opinion, at the time of the killing, the petitioner suffered from depression and alcohol intoxication. These factors were compounded by his personality characteristics and various psycho-social stressors, including a sick child, loss of employment with the resulting financial problems, his impending divorce, and the terminal illness of a brother. Dr. Zager testified that, in her opinion, the petitioner acted in an impulsive manner in killing his wife, rather than pursuant to a preconceived plan.

On cross-examination, Dr. Zager admitted that she based her opinion concerning the petitioner's intoxicated state on statements he made to her and statements of other witnesses who saw him drinking on the day of the murder. She agreed that no one she interviewed remarked on whether the petitioner exhibited any of the typical physical signs of intoxication, such as slurred speech or lack of coordination.

Randy Helms, the petitioner's prior employer, also testified on behalf of the petitioner. Mr. Helms said that before the killing, the petitioner had been severely depressed because of his family problems.

The petitioner attempted to call his sister, Sheryl Arbogast, to testify regarding his state of mind at the time of the murder, but she had no first-hand knowledge of the petitioner's state of mind on the night of the murder. In fact, Ms. Arbogast admitted she had not spoken to the petitioner for several months before the murder. Her testimony regarding the petitioner's state of mind was based on a conversation she had with her brother, Jeff Hall, since deceased, on the day of the murder. The trial court would not permit this hearsay testimony to be admitted before the jury. At the conclusion of the evidence, the jury found the petitioner guilty of first degree premeditated murder.

During the sentencing phase the state recalled Dr. Smith to testify in more detail concerning the extent of the victim's injuries. The state introduced photographs of the injuries taken at the autopsy to illustrate Dr. Smith's testimony. These photographs depicted the numerous external wounds the petitioner inflicted while struggling with the victim.

The petitioner called Dr. Zager and Dr. Joe Mount, a psychological examiner who counseled the petitioner at Riverbend Maximum Security Institution. Both described the petitioner as depressed, remorseful, suicidal, and extremely concerned about his children. Dr. Mount testified that the petitioner had been diagnosed as suffering from an adjustment disorder with mixed emotional features (anxiety and depression) and "substance abuse of dependence by history."

Randy Helms also testified again. He described the petitioner as a good, dependable employee and told how the petitioner had cared for his children when he brought them to work with him. Helms stated that the petitioner loved his wife and children and had hoped to reconcile with the victim.

4

The petitioner also presented his three sisters and his mother to recount the history of the petitioner and his family. The petitioner was the youngest of seven children. His father, an alcoholic, physically and verbally abused his wife until he died from a heart attack in 1974 when the petitioner was ten. The petitioner's father denied that the petitioner was his son and snubbed the petitioner. The witnesses' descriptions of the fights between the petitioner's parents eerily paralleled the petitioner's final confrontation with his own wife. All of the petitioner's relatives described him as a good father who loved his children.

## Post-Conviction Hearing

At the post-conviction hearing, Debbie Davis, the petitioner's sister, who also testified during the penalty phase of the petitioner's trial, testified that she was not contacted by her brother's attorneys until the night before she was to testify. Ms. Davis believed that she had information that would have been useful during both the penalty and guilt phases of the trial. She said that the petitioner was living at her home when he met the victim. Ms. Davis said she had the opportunity to observe her brother and the victim on many occasions and stated that she often witnessed the victim being abusive, both mentally and physically, to her brother. On one occasion, she saw the victim kicking at the petitioner's groin area. She described their relationship as "different" in that "Billie was always in charge of everything. Billie was in charge of all the bills. Everything was always in Billie's name. Jon handed Billie his paycheck. She did everything." She also stated that the petitioner and the victim used illegal drugs. Ms. Davis said her brother had a habit of disconnecting telephone lines of which she first became aware when they were living in Fayetteville, North Carolina. She said the victim and the petitioner were having a party and neighbors threatened to call the police. However, the petitioner disconnected their telephone to prevent them from calling the police. Ms. Davis said that on a separate occasion, the petitioner disconnected his mother's telephone. Ms. Davis believed the petitioner disconnected telephone lines because, as the youngest child, he was "vying for attention." Regarding the victim, Ms. Davis stated that she often fabricated stories about herself. Ms. Davis did not believe the petitioner killed the victim with premeditation. She said he was hopelessly in love with the victim.

Ms. Davis testified that she believed that the petitioner held more than "normal fears of police officers." Ms. Davis explained that she had owned a Golden Corral Family Steakhouse in North Carolina and had encouraged police officers to eat there. However, if police officers were in the restaurant, the petitioner would go to the back because he was "just totally terrified of police officers." Ms. Davis also noted the petitioner's affection for his dog, Sampson.

Regarding family background, Ms. Davis testified that her father would often come home drunk. On these occasions, their mother and father would get into fights and their father would end up beating their mother. Ms. Davis described their relationship as their mother "picking on" their father until he "would . . . just lose it . . . ." She recalled one incident when the petitioner was two or three years old. Their father had their mother pinned to the floor, banging her head on the floor. Big clumps of their mother's hair lay on the floor and "there was a lot of blood." The petitioner got a fly swatter and tried to make their father stop. The violence between his parents often involved

5

"gun play." On one occasion, their mother held a gun on their father and gave him to the count of ten "to get across the yard." The gun was not loaded. Ms. Davis said that her parents went through cycles where the violence would erupt and then "they'd be all lovey-dovey." When Ms. Davis grew older, she would take the younger children and leave. Ms. Davis stated that her paternal grandfather exhibited the same traits as her father. Her grandfather, Chuck, was an alcoholic and beat his wife. On one occasion, her grandfather had cut all of her grandmother's clothing.

Ms. Davis testified that the petitioner's father believed he was not the petitioner's biological father. Because of this, he favored his other son, Joel, treating Joel to piggyback rides and other fatherly activities. When the petitioner asked for similar treatment, his father pushed him away. Ms. Davis said that because of his father's neglect of him, the petitioner's mother overcompensated and was very loving toward him.

Ms. Davis testified that the petitioner's father died in 1974 and that his mother remarried shortly thereafter. She said that her stepfather was "awful" and that only the petitioner and two other siblings lived in the household during this time. She said her stepfather also was abusive to their mother.

Ms. Davis testified that the petitioner's brother, Jay, was diagnosed with "manic depressant" after he tried to commit suicide. She said another brother, Jeff, died of AIDS in July 1995, noting that the petitioner and Jeff were very close. Ms. Davis recalled Jeff having a "very calming effect. He was a wonderful brother." Jeff was married and had children but kept his disease secret from his family. She said no attorney ever approached Jeff before his death to preserve his testimony. No one interviewed him despite the fact that Jeff was the one who turned the petitioner in to the police after the victim was killed. Ms. Davis stated, "We also know that when Jon went to Jeff's house, he didn't realize he had killed her, and his frame of mind and what his demeanor — all that information, Jeff had first-hand knowledge of, but we weren't — no one could get that information from Jeff . . . ."

Ms. Davis testified that when the petitioner's trial attorney talked with her the night before her testimony, he instructed her as to what "not" to say during her testimony. She was asked "not to say anything negative about the victim because . . . she was already a victim . . . ." Ms. Davis testified that she could have provided trial counsel with photographs and videotape of the petitioner being a loving father if they had asked. She added that trial counsel did not attempt to interview any of the petitioner's sisters. She did recall that Gloria Shettles, an investigator, contacted her sisters about the petitioner's mental condition but that no follow-up occurred. Shettles had provided the family with the diagnosis "intermittent explosive disorder." Ms. Davis concluded that this diagnosis described the petitioner "to a T."

Ms. Davis also testified concerning an incident occurring during her brother's trial. Ms. Davis said that she observed people comforting and hugging members of the victim's family in the hallway of the courthouse and that she later realized one of these people was a juror. Ms. Davis stated she brought this to the attention of trial counsel. She further testified that after the jury

6

returned the death sentence, trial counsel provided the family with a letter authored by the petitioner relating the events of the night of the victim's murder and made comments including, "Well, so you don't feel so bad," and "So you can see that this was intentional."

On cross-examination, Ms. Davis conceded that most of the information regarding the petitioner's mother and father was provided to the jury during the penalty phase of the trial. She also admitted that she, her sister Kathy, her sister Sheryl, and their mother testified during the penalty phase. She further conceded that her brother had a history of angry outbursts and that he was "what some people would call a hothead."

Sheryl Arbogast, another of the petitioner's sisters, testified that she was the fifth of seven children, with the petitioner being the youngest. She said that she was the sibling most involved in her brother's case. For example, she took notes from telephone calls, provided him with hearing dates, and informed him of the attorneys who would be representing him. She stated that no one came to see her about the petitioner's case before the trial. Notwithstanding, she repeatedly tried to talk to trial counsel. When she finally spoke with trial counsel, they told her that they were not able to release any information to her without the petitioner's permission.

Ms. Arbogast testified that her testimony at the penalty phase of her brother's trial was limited to approximately twenty-five lines of the transcript, including only limited information regarding their childhood and their parents tumultuous relationship. She added that preparation of the witnesses did not occur until "the night before by telephone, and the actual face-to-face took place 15 minutes prior to testifying." Ms. Arbogast stated that she talked with Gloria Shettles, who was to conduct a mitigation assessment, by telephone one or two times. She said they discussed "intermittent explosive disease," which both agreed was something that needed to be explored regarding the petitioner's behavior. Ms. Arbogast, however, had no knowledge as to whether a psychiatrist was hired to evaluate the petitioner. Regarding her brother's mental condition, Ms. Arbogast observed

> [a] quick temper, depression, emotional lability [sic], crying, and not just crying but like hours at a time and not being able to stop crying, just loss of control over your emotions. He had not been able to hold a job because of that, and it was affecting everything in his life. He . . . had weapons pulled on him, and the situation was becoming more and more volatile. I was afraid for his life and for the situation that they were in, that it could only have a bad outcome. We wanted him to get out of the marriage and leave that situation. I wanted to hospitalize him.

Ms. Arbogast related that the petitioner grew up in Ligonier, Pennsylvania. She said that she began residing in the family home at eight years of age and remained there until she left for college. Ms. Arbogast testified that her parents fought "all the time" and that her father "drank everyday." She believed that his drinking was the catalyst to the fighting. Their fighting "frequently led to

7

pushing and shoving, and on a number of occasions there were just horrible knock-down drag-out fights where bones would be broken and blood would be flying and hair was being ripped out by the roots . . . ." She said the children would attempt to break up the fight to protect their mother. She added that if there was not a physical fight, her father would not speak to their mother, rather he would "turn his back on her" and "put a pillow over his head." Ms. Arbogast tried to get her mother to leave their father but her efforts were unsuccessful.

Ms. Arbogast corroborated her older sister's testimony that the petitioner was closest to their brother Jeff, who died of AIDS in 1995. Ms. Arbogast said that she informed trial counsel that Jeff had AIDS and that they needed to interview him. Ms. Arbogast traveled to Texas and took her ailing brother to have a statement notarized because no one had ever contacted Jeff for any information on the petitioner's behalf. Jeff's statement was made three months before his death. Ms. Arbogast stated that a fellow inmate of the petitioner had advised them to take the statement. Ms Arbogast took it upon herself to take Jeff's statement because she believed no one else could provide Jeff's side of the story. She stated that Jeff could have provided information as to instances when the victim had pointed a gun at the petitioner and that the petitioner was planning to move to Texas to be near Jeff and start over. She believed that only one side of the story was presented at her brother's trial.

Ms. Arbogast testified that she observed the relationship between her brother and the victim. She stated that the victim berated the petitioner constantly and said negative things about him. She said that she and other family members had observed bite marks on the petitioner which were inflicted by the victim and that she informed trial counsel of this. She did not believe that her brother had, in a premeditated manner, killed the victim. She said trial counsel never inquired as to the nature of the victim and the petitioner's relationship. She corroborated the testimony of Ms. Davis regarding the petitioner's habit of disconnecting telephone lines in order to gain the full attention of the person he was confronting. She stated that if trial counsel had asked, she would have provided this information to him.

As to the petitioner's aptitude as a father, Ms. Arbogast described him as "extremely attentive and loving" and "very well-versed in what their likes and dislikes were and how to feed and cook for them." She said the petitioner also impressed her with his ability to do therapy with his daughter who had cerebral palsy. Ms. Arbogast said trial counsel never asked her any questions regarding the petitioner's abilities as a father during the penalty phase of the trial. She stated she attempted to draw trial counsel's attention to the positive attributes of her brother, but she felt they were not interested in learning about the petitioner's background.

On cross-examination, Ms. Arbogast stated that from 1977 until 1994, she saw the petitioner only about twice a year. She conceded that she provided Gloria Shettles with "all this family history" during her telephone conversation with her. She admitted that the petitioner had been interviewed and evaluated by Western Mental Health and had been determined competent to stand trial. He had also been evaluated at Middle Tennessee Health Institute. She admitted that she was aware the court had appointed a psychologist to evaluate her brother's mental condition. Ms.

8

Arbogast also conceded that she never personally witnessed any bite marks on the petitioner; rather, her mother had informed her of this fact. She stated that she was aware that the victim had an order of protection against the petitioner. She said that she had no knowledge of any events occurring on the night of the murder.

Kathy Hugo, another sister of the petitioner, stated that she testified at the trial. She said testimony consisting of about three and one-half pages of the transcript related to the domestic abuse occurring during the petitioner's childhood. She said that trial counsel had not contacted her until 11:00 p.m. the night before she was to testify. Counsel advised her that she was not to say anything negative about the victim and to limit her testimony to what it was like growing up in their home. Ms. Hugo said trial counsel asked her whether she thought the petitioner was a good father. She stated that had she been asked by trial counsel, she could have put together photographs of the petitioner when he was a child and photographs of the petitioner and the victim. She said that during the three and one-half years this case was pending, trial counsel never contacted her.

Clarence Stanfill, a friend of the petitioner, testified that the petitioner was an excellent father. He said that the petitioner quit his job as a mechanic to stay at home and take care of the child with cerebral palsy. Mr. Stanfill said that he was never contacted by trial counsel or law enforcement officers regarding the murder. Joe Henry Stanfill, another friend of the petitioner, also testified that the petitioner was a good father.

Valene Foreman, a neighbor of the Halls, testified that on the night of the murder, the petitioner came to her home and gave her twenty-five dollars to give to her father. He said he owed her father money and he would give him the rest later. Ms. Foreman added that the petitioner was the primary caretaker of the children. She said law enforcement officers never contacted her regarding the victim's murder. She recalled that "[t]wo ladies came up there on Sunday and asked [her]." Paula Foreman, Valene's sister, testified that she would babysit for the Halls "off and on." She stated that the petitioner was nice to her and that he was a good father. Pamela Foreman, a resident at 480 Pleasant Hill Drive in Lexington, testified that the petitioner was her neighbor and that she would often babysit for him and his wife. She stated that the petitioner would care for his children. She said she was never questioned by law enforcement officials or trial counsel regarding the night of the murder.

Jackie Brittain testified that he met the petitioner through a business operated by his wife. This acquaintance developed into a friendship, although he did not know the victim very well because the Halls had begun having marital problems. He said the petitioner started staying with him because the victim had asked him to leave and had an order of protection against him. He said that despite the order of protection, the victim would come over to try to talk with the petitioner. Mr. Brittain related that he had never seen the petitioner lose his temper. He said that two days before the victim's murder, a neighbor of Mr. Brittain was involved in an argument with his wife. The petitioner stopped this man from hitting his wife, stating "You may have a license, but that don't give you the reason to beat her." Mr. Brittain further testified that the petitioner was a good father. The petitioner, being an auto mechanic, would fix Mr. Brittain's car without compensation. Mr.

9

Brittain explained that the state had subpoenaed him to testify at the petitioner's trial. Although he responded to the subpoena, the state never called Mr. Brittain to testify. He said the petitioner's trial counsel spoke with him at the courthouse.

On cross-examination, Mr. Brittain stated that he provided law enforcement officers with a statement soon after the murder. He admitted that he told members of the TBI that the petitioner had made threats to hurt the victim. On redirect examination, Mr. Brittain stated that the threats were made while "joking around."

Darlene Brittain, Jackie Brittain's wife, testified that she never saw the petitioner angry with anybody. She said that the victim treated the petitioner "[l]ike shit. She said the victim was extremely commanding, demanding and abusive to him." Ms. Brittain saw the victim hit and kick the petitioner. She said, "[The victim] was constantly bitching at him. . . . She would downgrade him, like he wasn't worth anything, that he couldn't do anything right." She said that the petitioner would take it for a long time, sometimes getting mad and other times ignoring it. She corroborated her husband's testimony that the victim attempted to contact the petitioner while the order of protection was in place. Ms. Brittain stated that trial counsel never asked her any questions regarding the victim's treatment of the petitioner and his reaction to it. She stated that the petitioner was a good father.

On cross-examination, Ms. Brittain was questioned regarding a statement she made to TBI Agent Brian Byrd that "[the petitioner] was going to grind his wife up into hamburger meat." Ms. Brittain had no recollection of this statement. Ms. Brittain did recall that the petitioner's trial counsel informed her that they would not call her as a witness because of the "hamburger" statement. She said that trial counsel would not consider the fact that she denied making this statement.

Martin Eskew, the victim's brother-in-law, testified that the petitioner was a "[s]poiled brat, self-absorbed, only him." Mr. Eskew said that the victim and the petitioner fought a lot. He added that the petitioner drank a lot. He said that he was never contacted by trial counsel.

Margie Diana Pearson testified that, on July 29, 1994, she was at a bar and that she barely recalled drinking with the petitioner. She testified that she could not remember whether the petitioner had commented about plans to kill his wife. Alice Jo Pearson testified that she barely recognized the petitioner at trial, although she recalled being at a bar and having some drinks with him. She did not recall him making statements that he intended to kill his wife.

Clay Mayo, along with Jesse Ford, represented the petitioner at trial. Mr. Mayo was appointed "second chair" counsel, and Mr. Ford was appointed lead counsel in late 1995 or early 1996. As part of preparation for the trial, Mr. Mayo and Mr. Ford had access to a court-appointed investigator, a mitigation investigator, a fact investigator, and a jury consultant. Mr. Mayo testified that if a witness needed to be interviewed, counsel would instruct an investigator to conduct the interview.

10

Mr. Mayo testified that he was aware of the importance of developing a strong mitigation defense during the penalty phase of a capital trial. In this regard, he said he spoke with a lot of the petitioner's family members on the telephone. He recalled that many of the petitioner's family members resided out of state and that some were interested in helping while others were a lot less interested. Mr. Mayo said that not only did he talk with members of the petitioner's family but that Gloria Shettles, the mitigation expert, had interviewed family members. He recalled the death of Jeff Hall and the problem with introducing his statement. He specifically recalled that the petitioner was concerned about his brother's statement and wanted it presented. Mr. Mayo could not recall any theory or tactic discussed to introduce the statement, although he did recall discussing the issue with Mr. Ford.

Mr. Mayo testified that they had specific concerns over trial strategy. Voluntary intoxication was seriously considered as a defense to nullify the intent on first degree murder. He said that the petitioner wanted them to argue self-defense. Mr. Mayo said he believed that a theory of self-defense would have alienated and inflamed the jury. The primary theory was that the murder was a second degree murder. However, certain facts presented problems, including the cut telephone wires, the multiple wounds, the lack of injury to the petitioner, and the evidence that he had dragged the victim from the house to the swimming pool and drowned her.

Mr. Mayo testified that the petitioner did not want an insanity plea. In any event, he spoke with Dr. Lyn Zager, the court-appointed psychologist, who "made it very clear that . . . [an insanity defense] was not supported . . . by her interviews with Mr. Hall." Mr. Mayo stated that he would have pursued an insanity defense if supported by the proof, regardless of the petitioner's wishes, but that no evidence existed to support such a defense. Mr. Mayo said he did not believe the petitioner was insane.

Although Mr. Mayo agreed that the act of disconnecting the telephone wires gave the impression of preparation, he did not believe that this act alone established premeditation. He said that although trial counsel was aware of the petitioner's past behavior of disconnecting telephone lines, they believed this behavior would not change things significantly. Mr. Mayo added that the petitioner would have had to testify concerning his past behavior but that his "demeanor in the courtroom was very bad, very scary, and having him on the stand, strategically, would have been horrible." He conceded, however, that post-conviction counsel may have been correct that the evidence might have taken away the "sting" of the wires being disconnected. Mr. Mayo stated that such information "would take some sting out if you could produce someone that said he'd done this before to get the attention of the person that was, for example, inside the house." However, he said that such an act also painted a picture of someone who is on the edge. Mr. Mayo stated that he could not conclude how this information would have been helpful. Although he agreed with post-conviction counsel that the act of cutting the telephone wires looked sinister, he stated that it looked sinister whether or not anyone was hurt.

Similarly, Mr. Mayo was questioned why evidence of acts of violence by the victim toward the petitioner was not introduced. He had trouble recalling the specific reasons, but he indicated that

11

he believed her actions were not severe enough to imply that the petitioner's conduct was reasonable. Mr. Mayo said he believed there was no chance of moving past second degree murder and getting voluntary manslaughter. He noted that the petitioner would have been the only witness to establish any element of provocation. Regarding the possibility of the petitioner testifying, Mr. Mayo said that "it would have been a catastrophe . . . not just cross-examination but his demeanor, his attitude, his lack of remorse." Mr. Mayo conceded that information provided by Dr. Zager indicated remorse. He also recalled that the petitioner maintained that he never intended to kill the victim. He said that by the time the case got to trial, the petitioner "was on the verge of a violent outburst all the time, and had a couple and was taken out of the courtroom in shackles, had guards posted behind us." He described the petitioner as "a five-year-old brat in an adult's body that . . . wanted to run the show from start to finish and . . . didn't exhibit any real remorse." Mr. Mayo added that the petitioner was "narcissistic in the extreme." He also said that although he found the petitioner unpleasant to work with, his opinion did not affect the level of his representation.

Mr. Mayo recalled Gloria Shettles mentioning Intermittent Explosive Disorder in a 1995 report. He could not recall, however, doing any additional research or reading regarding the disorder. He also could not recall whether trial counsel sought the services of a psychiatrist, but he added that although a psychiatrist would prescribe medication, a psychologist would "deal with the real issues."

Regarding the petitioner's good qualities as a father and person, Mr. Mayo testified that he was sure that such evidence was presented. Mr. Mayo recalled that they did not introduce any photographs of the petitioner, but he was unable to remember the rationale. He stated that although family members could have testified that they knew of no reason to believe that the victim's murder was premeditated, there was concern about questioning by the prosecution on cross-examination. Mr. Mayo stated that an offer of proof was made regarding Jeff Hall's statements to Ms. Arbogast. Mr. Hall died in July 1995, before Mr. Mayo was appointed. Mr. Mayo agreed that an attorney's failure to attempt to preserve the testimony of a dying witness would be, at least, close to negligence if the testimony were favorable to his client. He qualified this statement, however, by stating that preservation would not have been necessary if the favorable information were merely opinion. Notwithstanding, Mr. Mayo stated that Mr. Hall should have been interviewed even without knowing what the information he possessed.

Mr. Mayo testified that there were many instances of violent behavior by the petitioner toward the victim that the state did not use because it had a good case. He provided examples such as the petitioner running his vehicle into the victim's car while the children were inside of it. Mr. Mayo stated that if trial counsel would have inquired as to the petitioner's good traits, the prosecution would have questioned the witnesses as to the bad acts of the petitioner. Mr. Mayo could not recall why opening and closing arguments and the hearing on the motion for a change of venue were not transcribed for purposes of creating an appellate record.

On cross-examination, Mr. Mayo testified that during his preparation of the case, no evidence of provocation was revealed. He stated that Larry Southard, Director of Forensic Services at Middle Tennessee Mental Health Institute, evaluated the petitioner, found him to be competent, and

12

determined that an insanity defense could not be supported. Mr. Mayo stated that the fact that an insanity defense could not be supported was discussed with the petitioner. Other defenses were discussed with the petitioner, including intoxication and arguing for a lesser offense. Mr. Mayo could not recall one witness who could have testified about "good things about [the petitioner] without allowing the state to get into prior violent acts." Additionally, the petitioner's children testified during the trial. As part of cross-examination, the children were asked about the petitioner's treatment of them. Mr. Mayo could not think of any motions they could have filed or any witness they could have called that could have made a difference. He admitted that he had access to the state's file and that no surprises were introduced at trial. He said he was only surprised that the state did not introduce more evidence, including statements made by the petitioner.

Jesse Ford, lead counsel appointed to represent the petitioner, testified that this was his first capital case. Mr. Ford said that he and Mr. Mayo agreed that he would handle the guilt phase and Mr. Mayo would handle the mitigation work. Mr. Ford recalled speaking to one of the petitioner's sisters, Sheryl Arbogast, once or twice. He stated that Mr. Mayo talked to her a lot because that was more of the mitigation part of the case. Mr. Ford could not recall speaking to other family members in preparation of the case, although he stated that he "may have."

Mr. Ford testified that Jeff Hall was already deceased at the time of his appointment and that his testimony had not been preserved in any "for sure" admissible form. Mr. Ford said that if a witness had something useful, a deposition would have been warranted. He said that Mr. Hall's unavailability at trial was not predictable because one's time of death is uncertain.

Regarding the change of venue, Mr. Ford recalled reading newspaper articles and determining that a change of venue was "absolutely necessary." He said that this matter was discussed with the petitioner at length and that a motion was filed with the petitioner's permission. Mr. Ford stated that Judge LaFon granted the change without a hearing. Mr. Ford only became aware of the petitioner's dissatisfaction with the change of venue after the fact.

Mr. Ford testified that one of the defense theories before trial was voluntary intoxication. The petitioner had consumed five or six beers before going to the victim's residence. Mr. Ford attempted to find witnesses who knew that the petitioner had a drinking problem. He said the petitioner refused to testify. Based on these factors, he decided that the defense was unable to pursue this avenue at trial. Mr. Ford said that, ultimately, the defense hoped that the "jury would show some mercy." He said the defense relied upon a theory that the petitioner was acting in an impulsive manner.

Mr. Ford testified that he believed the possibility of reducing the charge to manslaughter was slim because the petitioner refused to testify. He stated that a jury wanted to hear from a defendant. Mr. Ford discussed with the petitioner the need for him to testify, but the petitioner refused to take the stand. Agreeing that proof of the victim's acts of violence against the petitioner would have been evidence of provocation, Mr. Ford explained that the only reliable source of this type of testimony was from the petitioner.

Mr. Ford testified that the petitioner provided counsel with a list of people he wanted found. Mr. Ford said that they sought every available person but that he determined that the witnesses' testimony would not be helpful. Mr. Ford stated that, for instance, the Brittains' statements included the petitioner's threat that "he was going to grind [the victim] up as hamburger meat." Mr. Ford recalled that the petitioner made this statement to several different people, and he believed the statement precluded any opportunity to call these people as witnesses. Mr. Ford admitted that he did not talk with Kathy Hugo and Debbie Davis. He acknowledged that the petitioner's sister, Sheryl Arbogast, wanted to testify, but he said Ms. Arbogast had no contact with the petitioner for two years before the murder. On cross-examination, Mr. Ford stated that "from what I understood, [the petitioner's sisters] didn't have a very good relationship with Mr. Hall, that they weren't really a part of his life until after he did what he did, and then they became . . . more a part of his life . . . ."

Evaluating the evidence establishing premeditation, Mr. Ford recalled that the petitioner had cut the telephone line and that, at one point, one of the children was on his back telling him "Daddy, please stop." The petitioner had several opportunities to withdraw from what he was doing. Mr. Ford disagreed with post-conviction counsel's assertion that evidence of prior incidents of disconnecting telephone lines without any harm being inflicted would have negated premeditation. Mr. Ford stated that this evidence shows that the petitioner wants to control situations and plans to do the same. He said police reports from Carroll County had established that the petitioner had previously disconnected telephone lines.

Mr. Ford testified that he was aware of the report from Gloria Shettles mentioning Intermittent Explosive Disorder. He said that if any follow up was needed in this area, he was of the opinion that Dr. Zager would have recommended further evaluation. He said that Dr. Zager had access to all of defense counsel's information but that Dr. Zager did not indicate any need to pursue Intermittent Explosive Disorder. Mr. Ford noted that the petitioner was also evaluated by the state psychiatrist. Mr. Ford acknowledged that he did nothing to convince the jury that the petitioner suffered from Intermittent Explosive Disorder. He added, though, that they discussed the information regarding the disorder with the petitioner who did not want to pursue that defense. Mr. Ford said that the petitioner did not believe he did anything wrong by killing the victim.

Mr. Ford testified that the petitioner's children were cross-examined during the guilt phase as to whether the petitioner was a good father and provider. Mr. Ford explained to the petitioner the dangers involved in child testimony. He acknowledged that there were allegations that the petitioner had abused the children. Mr. Ford chose to limit character witnesses to avoid opening any doors that would permit questioning concerning the claimed abuse. He added that the petitioner's former employer, Randy Helms, was called to testify during the penalty phase in an attempt by defense counsel to humanize the petitioner. He said that Mr. Helms was selected because he was the most credible witness with an unimpeachable reputation.

Mr. Ford testified that they knew the state's proof and that no surprises arose at trial. He said he explained all of the evidence to the petitioner before trial. He said that the victim's family wanted

14

leniency and that the state offered life without parole. However, the petitioner insisted upon going to trial.

Dr. Pamela Auble, a clinical neuropsychologist, testified that she evaluated the petitioner at the request of post-conviction counsel. The purpose of the evaluation was to determine whether any deficits or problems in memory or thinking existed which might be due to brain injury and to determine personality and emotional functioning. Dr. Auble stated that her evaluation process consists of three areas: (1) interviews, (2) standardized testing, and (3) a review of relevant social, legal, medical, psychological, and school records. She said that in gathering information about a client, it would be necessary to interview all immediate family members and that the failure to do so would result in an incomplete social history.

Dr. Auble stated that she administered the following tests measuring mental ability to the petitioner: the Wechsler Adult Intelligence Scale (an IQ test), the Wechsler Memory Scale (a test of one's ability to learn new information), the Test of Memory Malingering (a test to evaluate whether one is putting forth adequate effort on the test procedure), the Halstead Reitan Battery (six tests measuring mental flexibility, executive functioning or reasoning, attention, right hemisphere functioning, concentration, language comprehension, fine motor speed, spatial reasoning and memory), the Delis Kaplan Executive Functioning System (a test to determine the adequacy of a person's frontal lobe functioning, i.e., thinking, reasoning, and one's ability to inhibit responses), the Boston Naming Test (a test to determine language dysfunction) and the Grooved Pegboard Test (a test to measure motor dexterity). She also administered three tests of personality and emotional functioning, including the Rorschach (traditional inkblot test to test personality style and functioning), the Minnesota Multiphasic Personality Inventory (a test to measure personality and emotional functioning), and the Incomplete Sentences Blank (a structured interview of the client). In exploring the petitioner's background, Dr. Auble reviewed

> various interviews, both of [the petitioner] and his family, friends, people he associated with by April Higuera, by Tammy Askew, by Gloria Shettles. I reviewed a Mitigation Assessment done by Ann Charvat, a summary of the testimony of Lynn Zager and Joe Mount, records from Middle Tennessee Mental Health Center, records from the Newborn Intensive Care Discharge Summary, a summary of audiotapes of the trial, the Tennessee Department of Employment Security Appeal Decision, the Tennessee Department of Correction progress notes, the report of Dr. Caruso, Inmate Grievance Forms, material prepared by Mr. Hall regarding ineffective assistance of counsel and a genealogy chart.

Dr. Auble testified that she spent approximately nine hours interviewing and administering tests to the petitioner.

Dr. Auble summarized her findings relative to the petitioner as follows:

> The results of the neuropsychological testing were essentially normal in most areas. There was no evidence of malingering or faking. The neuropsychological testing did indicate some difficulties with attention and response speed, something that I – in my opinion was consistent with attention deficit disorder, most likely. The personality testing revealed a person who does have difficulty controlling his emotions in emotional situations. His responses are likely to be unmodulated. [The petitioner] has a low self-esteem. There was evidence of internal anger. He may have trouble understanding people and perceiving them in accurate ways. At the time I saw him he did not appear clinically depressed, though there was evidence of some tension from his current situation.

Dr. Auble further stated that a low serotonin level would be consistent with Intermittent Explosive Disorder.

On cross-examination, Dr. Auble was directed to a statement in The Diagnostic and Statistical Manual, Volume 4 (DSM4),[1] providing that "the diagnosis of Intermittent Explosive Disorder is made only after other mental disorders that might account for episodes of aggressive behavior have been ruled out and it includes attention deficit disorder in there." She then qualified her prior testimony, stating that her testing was not definitive as to whether the petitioner did or did not have attention deficit disorder. She added that her opinion was not that attention deficit disorder was accounting for the petitioner's episodes of aggressive behavior if he did have attention deficit disorder.

Dr. Auble conceded that her conclusions about the petitioner included that "at the time of the crime there was evidence of Intermittent Explosive Disorder, adjustment disorder, major depression, alcohol dependence, and cannabis abuse." She admitted that the DSM4 required that alcohol or drug abuse be ruled out as possible causes of anger before diagnosing Intermittent Explosive Disorder. She acknowledged that on the date of the murder, the petitioner was both intoxicated and under the influence of marijuana. She conceded that the petitioner had visited several bars on the night of the victim's murder and that he was angry when he left the bars. In Dr. Auble's opinion, however, the use of alcohol and drugs merely exacerbated the Intermittent Explosive Disorder. Dr. Auble admitted, though, that her evaluation did not eliminate the fact that the petitioner's aggressive episodes were caused from his adjustment disorder.

---

[1]AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed. text rev. 2000).

At the petitioner's trial, Dr. Zager testified that the petitioner was acting as a result of an impulse brought on by his anger. Dr. Auble agreed with the prosecution's summation of Dr. Zager's conclusion as

> his mental disease of Intermittent Explosive Disorder and adjustment disorder resulted in a rage reaction in which [the petitioner] was unable to premeditate this crime and in which his actions were not knowing in that he was unaware that his conduct was reasonably certain to cause his wife's death.

Dr. Auble conceded that her conclusion is basically the same conclusion reached by Dr. Zager. She further conceded that the diagnosis of Intermittent Explosive Disorder is not appropriate when the person is acting in a purposeful manner. She stated that the petitioner's purpose of going to the victim's home the night of the murder was to reconcile with his wife. She maintained, however, that this purpose is not that envisioned by the DSM4.

Dr. Keith Caruso, a forensic and general psychiatrist, testified regarding the correlation between low levels of serotonin in the brain and violent acts. He stated that recent research completed by Dr. Emil Coccaro in 2001 revealed that a biological marker for Intermittent Explosive Disorder is low levels of serotonin. This information is not contained in the DSM4, because the DSM4 was written in 1994, before this research was completed. Dr. Caruso said that a report from Dr. Ronald Salomon at Vanderbilt indicated that the petitioner's level of the major metabolite in serotonin, CSF 5-HIAA, was 70, a level in the bottom five percent. He said the normal level of serotonin is 139.1 and that the petitioner's level of serotonin is consistent with a person having Intermittent Explosive Disorder.

Dr. Caruso confirmed Dr. Auble's statement that a social history of a client would necessarily be comprised of more than talking with that client. He stated that interviewing family, friends, and past employers was very important. In evaluating the petitioner, Dr. Caruso testified that he was provided:

> a video. Also, I had a transcript of State versus Jon Hall from 1997. The excerpts that I've read included motions, testimony from Jerry Bingham, testimony from Brian Byrd, testimony from Chris Dutton, Stephanie Lambert, Cynthia Lambert, Jennifer Lambert, the medical examiner, Dr. O. C. Smith, Dr. Zager. Let's see, psychologist Joe Mount, Randy Helms, Debbie Davis, Kathy Hugo, Cheryl Arbogast, Carol Alexander. There was also mitigation information from Ann Charvat, correspondence with another attorney, Edward Martindale, regarding a civil suit. There was some media clippings. There was Jessica Hall's medical records. There were TDOC mental health records for the defendant. There were records from Middle Tennessee Mental Health from, I believe, a competency and sanity

> evaluation that were done in '95, disciplinary records from TDOC. There were memos from Glori[a] Shettles who had been a mitigation specialist previously in this case and interviews that she had done with various family members. A time line done by Danese Banks. Numerous interviews by Ms. April Higuera with the defendant over a span of . . . two years. Interviews by Ms. Higuera of family and friends. A genealogy memo that Ms. Higuera had provided. Written materials that Ms. Arbogast had provided. More mitigation timelines. Memos about the trial audiotapes. Interview of Judge Whit LaFon by Ms. Higuera and other witnesses. Dr. Auble's neuropsych eval and Dr. Saloman's report.

Dr. Caruso also interviewed the petitioner on January 28, 2002, for three and one-half hours and on March 19, 2002, for four hours.

After reviewing the information and interviewing the petitioner, Dr. Caruso formulated the following impressions:

> I think there was a lot of evidence of character pathology which one would expect in light of the dysfunctional home that he grew up in, but on top of that there are also – and there also seemed to be a great degree of substance abuse, both in [the petitioner] and also in family members. There was a lot of major depression in family members. [The petitioner] had a history of depression. . . . I felt that it wasn't just an adjustment disorder in that he seemed to respond to some anti-depressant medication that he'd received. I believe back in 1995 he was on Imipramine and, although he couldn't tolerate the side affects, had done somewhat better and reported feeling better on the medication. In addition, there was a history of numerous episodes of [the petitioner] exploding into violence either where he assaulted people or where he destroyed property, and I became suspicious on that basis of Intermittent Explosive Disorder as it seemed that there were times that that could not be accounted for by intoxication alone, and essentially – also I have spoken to you about some . . . of his outbursts in court, I believe, in a prior trial. And, again, there really seemed to be a lot of difficulty controlling his, you know, his behavior – controlling his emotions. And, also, consistent with that, that the only thing that seemed to have changed between those explosions and then being more conciliatory in terms of speaking with you that he . . . only time had elapsed.

18

Dr. Caruso added that there was a "very high co-occurrence" of "being an alcoholic and having Intermittent Explosive Disorder," in that alcohol reduces impulse control and that persons with Intermittent Explosive Disorder have poor impulse control.

Dr. Caruso testified that a person with Intermittent Explosive Disorder realizes that his act of violence is "not a good thing to do" but is without the capacity to stop himself. He stated that with regard to premeditation, a person with Intermittent Explosive Disorder is unable to achieve the mental state required for premeditation regarding the absence of passion or excitement. Dr. Caruso concluded that "because of Intermittent Explosive Disorder, major depression, and intoxication, but . . . mostly Intermittent Explosive Disorder . . . that [the petitioner] was unable . . . to achieve the mental state of the absence of passion and excitement."

Dr. Caruso testified that the petitioner met the criteria for a number of diagnoses, stating

> I felt that at the time of the offense he had Major Depression, Intermittent Explosive Disorder. I get that he was dependant on alcohol, so he had alcohol dependence. He had a dependence on marijuana. Cannabis dependence. I felt that he also had a history of polysubstance abuse where he abused a lot of other substances, such as LSD and Valium and other drugs, and I also felt that at the time of the offense there was evidence to indicate that he was suffering from alcohol intoxication as well. I felt also that he had met criteria for several personality disorders, including Narcissistic Personality Disorder, Borderline Personality Disorder and Antisocial Personality Disorder. I didn't feel that there was a medical condition impacting upon his mental state other than the ones I've specified here in terms of the depression and the Intermittent Explosive Disorder, et cetera. I also felt that there were a number of stressors at the time of the offense or that we list on Axis IV, including his fears of abandonment by his wife at the time of the offense, his daughter's disability and her special medical needs, the financial stressors related to his earlier unemployment. In addition, his brother's dying of AIDS at that time also were stressors operative at the time and, I think, at this time and not at that time we had the stressors related to legal charges. I felt that at the time of the offense he had a global assessment of functioning score of about 40. More recently it's about 55, and that's on a scale of 100 where someone with a scale of 31 . . . to 40 would be seriously impaired.

Dr. Caruso concluded that the technology and tests used in evaluating the petitioner were available in 1995, 1996, and 1997.

19

On cross-examination, Dr. Caruso agreed that the research results linking low serotonin levels and Intermittent Explosive Disorder was not available in 1995. He acknowledged that the results were presented first at the American Psychiatric Association Convention in 2001. He also agreed that this information is not contained in the current DSM4. Dr. Caruso further conceded that the petitioner's act of disconnecting the telephone lines for whatever purpose established that he was capable of "some degree of preplanning."

The petitioner testified regarding the attorneys that had been appointed to represent him at trial:

> Jack Hinson and Frank Stanfill were appointed. I heard that Frank Stanfill never had any in court experience at the time, and that Jack Hinson was the Public Defender at the time, but he was going into private practice and Frank Stanfill was just taking over that position.
>
> . . . .
>
> Well, the next time I went into court I went in for my Grand Jury appearance and they asked me did I have an attorney and I had not spoken to my attorney and the people at the courthouse told me that Jack Hinson was no longer with the Public Defender's Office. So the Judge asked me, you know, "Do you plead guilty or not guilty," and
>
> . . . .
>
> [a]fter Frank Stanfill and Jack Hinson I went through George Googe and Stephen Spracher.
>
> . . . .
>
> And after that I had Carthel Smith and Mike Mosier.
>
> . . . .
>
> And then I went through my trial attorneys, Jesse Ford and Clayton Mayo.
>
> . . . .
>
> And then I had on direct appeal . . . Mark Donahoe and Scott Petrowski.

20

The petitioner testified that his brother, Jeff Hall, had resided in Bell County, Texas, and had been suffering from AIDS since the early 1990's. He said he knew in August 1994 that his brother was sick. He said he informed his attorneys that they needed to interview Jeff because of the danger of him dying before trial. He could not recall, however, whether he told them that Jeff was dying of AIDS. The petitioner did assert that he was absolutely sure that he made George Googe and Steven Spracher aware of it before his brother died and "pretty sure" that he made Frank Stanfill aware of it. He said he had to go to trial without the benefit of a statement by Jeff.

The petitioner testified that he neither waived his right to a preliminary hearing nor asserted that he wanted to change venue to Madison County. When questioned as to the possibility of testifying, he said his attorneys conducted a mock examination of him and told him they did not believe he should testify. The petitioner asserted that he wanted to testify before a Henderson County jury. He added, however, that he also "argu[ed] an issue about the fact that the flag had a gold fringe and an eagle on it, and I told 'em that I felt that it was a . . . representative of a war court . . . ."

The petitioner testified that attorneys Ford and Mayo were appointed on February 9, 1996, and that the trial began on February 3, 1997. He complained that counsel visited him on only two occasions while he was in Nashville. He said he was transferred to Madison County in December 1996. While confined in Madison County, the petitioner was visited separately by counsel approximately five times. He complained that his attorneys never explained to him their defense theory. He stated that, if they had asked, he could have provided them with prior acts of violence perpetrated by the victim against him. He explained, however, that his attorneys did not want anything negative said about the victim during the trial. The petitioner added that his attorneys failed to present the Pearson sisters as witnesses even though they had been subpoenaed. He also said that he had objected to his attorneys resting the case because he thought there were more witnesses to present. The petitioner denied rejecting "any mental defect mitigation strategy." He said, "I always felt that I went insane because of what happened. That's the only thing that explains what happened to my wife." He claimed that "Mr. Ford told me that I needed to leave the psychs alone. They couldn't help me." The petitioner stated that his attorneys disregarded anything that he said and that he believed they felt animosity toward him. He concluded that he believed the biggest failure of his trial attorneys was not keeping him informed.

The petitioner testified that he and Chris Dutton were not cellmates, although they were on the same pod. He said that if he had been permitted to testify at his trial, he could have impeached Dutton's testimony. He also stated that he was not aware that the victim had died until he arrived in Texas.

Regarding the night of the murder, the petitioner testified that he had picked up a six pack of Busch "ponies." He then purchased a money order to pay the victim some child support. He said he drank the six-pack of beer and then drove to the victim's home. He said that the victim was not home when he arrived and that he drove back to "Jackie and Darlene's" where he consumed some

21

more beers. He said he then visited some bars where he consumed approximately nine to twelve more beers.

On cross-examination, the petitioner stated that he was not afforded a preliminary hearing on the kidnapping charge but conceded that he was not convicted of kidnapping. He admitted that he was provided a preliminary hearing on the murder charge. The petitioner failed to respond to the prosecution's statements that he had requested the change of venue. The petitioner also admitted that the trial court questioned him regarding his decision not to testify and that he had informed the court that he would testify if the "war flag" were removed. He explained, "There's nothing in the statute that says that there's suppose to be a gold braid on [the flag] for the jurisdiction of the court. That's why I – I'd say it's a badge of fraud."

The petitioner stated that "they ruined the intoxication defense whenever Judge LaFon instructed the jury that it was irrelevant for the culpable mental state . . . ." He admitted that he knew his defense was intoxication in order to receive a lesser-included offense. In response to questioning as to whether the victim physically provoked him, the petitioner said he never told anybody that she did. He explained that she did not physically provoke him, but she verbally provoked him. He stated that he did not make the mess in the bedroom and that someone had tampered with the videotape. He added that he went to the victim's house that evening to attempt a reconciliation.

The state called Dr. Kimberly Stalford, a psychiatrist, who conducted an evaluation of the petitioner. In completing her evaluation, Dr. Stalford (1) reviewed the trial transcript, (2) interviewed the petitioner for three and one-half hours, (3) reviewed the psychiatric evaluation by Dr. Caruso and the forensic neurological evaluation of Dr. Auble, and (4) read the indictment, multiple interviews by the TBI, a report of the petitioner's criminal history and disciplinary action, and various letters written by the petitioner. She also relied upon (1) two orders of protection filled out by the victim, (2) a civil summons for divorce, (3) a bill from Baptist Memorial Hospital, (4) a police report of domestic disturbance dated May 31, 1991, (5) a document captioned "Specific Instances of Acts or Omissions of Counsel," (6) a procedural history of State of Tennessee v. Jon Hall, and (7) medical records from Middle Tennessee Mental Health Institute. Dr. Stalford also had access to the petitioner's social history. She received "a biographical description on where a person's born, their childhood, their educational experience, their work history, their interpersonal relationships throughout their life, drug and alcohol use, issues such as that."

Dr. Stalford defined Intermittent Explosive Disorder as

> a psychiatric disorder that falls under the impulse control disorders like cleptomania, and it is classified by impulsive outbursts which usually inflict harm on objects or people. The diagnosis is – describes – The second criteria includes the outbursts in excess of what one would expect, and the third aspect of that diagnosis is that it can't be better explained by another psychiatric illness.

22

As a result of her evaluation, Dr. Stalford could not conclude that the petitioner had Intermittent Explosive Disorder because his behaviors were better described by other psychiatric illnesses. She stated:

> I believe that he has what we would describe as a personality disorder, and very much as Middle Tennessee described it, where he has some passive/aggressive traits, dependant traits, but I think the most notable traits are what we call anti-social traits or sociopathy, and within that diagnosis, there is a reckless disregard of other people and agitated and potentially violent acts, and I think his behavior is better explained under that diagnosis than intermittent explosive disorder.

She also diagnosed the petitioner with alcohol dependence.

Dr. Stalford explained that:

> Serotonin is a chemical in our brains. It is the way that nerves connect. When you have a nerve and the nerve stops, you need that nerve to talk to the next nerve, and the way it does it is the nerve releases a chemical that causes what we call the synapse to the next nerve, and that's how the nerves talk. And one of the chemicals in the brain that does that is serotonin. . . . [S]erotonin is what we call a neurotransmitter which basically is the way that nerves talk to each other.

She testified that because there are "so many medical neurological and psychiatric conditions that have been linked to altered serotoninergic levels that it's really not a terribly useful diagnostic test, which is why the forensic unit at Middle Tennessee doesn't even do it." She said that low serotonin levels have been identified in patients suffering from depression, schizophrenia, bipolar disorder, impulsive acts of violence, mood disorders, anti-social personality disorders, borderline personality disorders, myoclonus, dementia, sleep disorders, and even malnutrition. Dr. Stalford further discounted the usefulness of serotonin levels as a diagnostic tool by stating that (1) serotonin levels measured in the spinal fluid are not an accurate indication of the serotonin activity in the synapses where it works and (2) there is much question as to what are "normal" levels of serotonin. She stated that she reviewed the serotonin test results contained in Dr. Caruso's report.

Dr. Stalford concluded that, based on the events on the night of the murder, that the petitioner was able to think clearly and plan certain aspects of that night. She stated that neither drugs, alcohol, nor any psychiatric condition could explain the petitioner's loss of control.

23

## Summary of Trial Court's Findings of Fact and Conclusions of Law

The trial court rendered a comprehensive and extensive order reviewing the evidence presented and rendering legal conclusions as to the petitioner's allegations of constitutional error. After evaluating the evidence presented at the post-conviction hearing and the trial, the trial court made numerous findings of fact. The trial court found that the defense strategy at trial was that the petitioner did not plan to kill the victim but was merely attempting to pay child support and reconcile with the victim. The incident was characterized as an emotional domestic situation that merely escalated and got out of control. Defense counsel's questioning of witnesses was consistent with this theory throughout the trial. The trial court noted trial counsel's skillful cross-examination of state witnesses, including introducing proof supporting their theory that the petitioner was intoxicated at the time of the murder. Defense counsel presented evidence regarding the petitioner's mental condition.

In addressing the petitioner's post-conviction claims, the trial court made the following findings: The petitioner argued that trial counsel were ineffective for failing to inform the jury that the petitioner had a habit of disconnecting telephone lines to guarantee the undivided attention of the person he was confronting. The fact that the petitioner disconnected the victim's telephone line was relevant to the issue of premeditation. Trial counsel did elicit information that the petitioner had disconnected the victim's telephone lines during some of their previous arguments and convey this information to the jury. The trial court determined that "it would not have been in [the] petitioner's best interest to cite multiple incidents during which he felt it was necessary to disable someone's phone to keep their attention and/or prevent them from calling the police." The trial court concluded that trial counsel were aware of these prior incidents and reasonably elected not to present them.

The petitioner asserted that trial counsel had no real defense theory. The trial court rejected this claim. The trial court found that trial counsel made a valiant attempt to convince the jury that the petitioner was distraught, depressed, and intoxicated; that his behavior reflected an impulsive act as opposed to a planned act; that the state failed to meet its burden of proving premeditation beyond a reasonable doubt; and that the petitioner lacked the requisite mental state for first degree murder.

The petitioner claimed that trial counsel failed to present evidence of intoxication. The trial court found that trial counsel presented evidence that the petitioner was carrying beer when he arrived at the victim's home. The trial court also found that Dr. Zager testified that the petitioner had been drinking beer before arriving at the victim's home. Additionally, trial counsel was able to elicit through cross-examination of Chris Dutton that the petitioner was drunk when he had telephoned the victim earlier that day. The trial court concluded that the petitioner could not demonstrate that he suffered any prejudice from trial counsel's failure to present the testimony of either Diana Pearson or Alice Pearson as neither witness could testify regarding the amount of alcohol consumed by the petitioner, how quickly he consumed the alcohol, or how the alcohol affected the petitioner's behavior. The trial court determined that their testimony was irrelevant to the petitioner's theory of intoxication. Additionally, the trial court attached no probative value to the fact that the petitioner did not convey to the Pearsons his intentions of killing the victim.

24

The petitioner asserted that trial counsel failed to hire a psychiatrist to pursue the theory that he suffered from Intermittent Explosive Disorder and that he failed to compile an adequate social history. The trial court rejected these claims. The trial court noted that the petitioner failed to present the testimony of his pretrial attorneys, the investigators, or Dr. Zager. The trial court noted that Gloria Shettles did more investigation than the initial report included in the post-conviction record. Additionally, the trial court found that multiple orders granted funds for a private investigator. The trial court concluded that the court "would not have continued to grant additional funds unless trial counsel established that Askew was in fact conducting the investigation for which she was hired." The trial court further determined that Dr. Zager was an experienced defense witness in capital murder cases and "understood the importance of having access to all relevant information and would not have expressed her expert opinion in the absence of such information." Based on these factors, the trial court concluded that the petitioner failed to prove that trial counsel's investigation was inadequate. The trial court additionally concluded that Dr. Zager was not bound by the opinion of either an investigator or the petitioner's sister. The petitioner failed to establish that Dr. Zager was lacking in either experience or education. The trial court acknowledged that had Dr. Zager believed that the petitioner had Intermittent Explosive Disorder, Dr. Zager could have conveyed this to trial counsel and recommended further evaluation of the petitioner. It stated that Dr. Zager did not so recommend and that the petitioner had not established that Dr. Zager would have done so if provided with additional information. The trial court also stated that the petitioner was evaluated by the MTMHI forensic team, which included a psychiatrist, and noted that this team also failed to diagnose the petitioner with Intermittent Explosive Disorder. The petitioner could not establish the need for a second psychiatrist. Although the trial court acknowledged that the petitioner had presented the testimony of Dr. Caruso to support his theory that he suffered from Intermittent Explosive Disorder, the trial court did not place much weight on his testimony. It found that Dr. Caruso relied upon studies that did not exist at the time of the petitioner's trial. Moreover, the trial court found that the state's expert effectively impeached the post-conviction testimony of the petitioner's experts. The trial court concluded that the petitioner was not entitled to "shop" for an expert to provide a particular opinion. Finally, the trial court determined that because the state's post-conviction psychiatrist rejected the Intermittent Explosive Disorder diagnosis, the petitioner had not demonstrated that it was Dr. Zager's status as a psychologist which caused her to reject the theory.

The petitioner contended that trial counsel should have presented evidence that the victim was the aggressor in their relationship. The trial court acknowledged the facts as presented at trial, including that the petitioner forced his way into the victim's home, attacked her as her children watched in horror, informed the children that he would kill their mother if they called for help, chased the victim after she escaped, dragged her down the walkway, and held her under the water in the children's swimming pool. The trial court concluded that trial counsel were aware of the relevant facts and that they made a tactical decision not to attack the victim at trial. It also concluded that introduction of any evidence as to the victim's role as first aggressor would have had little to no legal significance as there was no proof that the victim provoked the petitioner at the time of her murder and that any attempt to argue to the contrary would have resulted in the immediate and irrevocable alienation of the jury. In a related issue, the trial court noted that the state possessed a

25

great deal of negative information about the petitioner that was not introduced at the trial. The trial court concluded that had trial counsel pursued an attack of the victim's character, the state would have taken the opportunity to reveal many facts which would have harmed the petitioner much more than presenting evidence concerning the victim's past behavior would have benefitted him.

The petitioner argued that trial counsel were ineffective for failing to interview his brother, Jeff Hall, and preserve his testimony for trial. The trial court faulted the petitioner for failing to present the testimony of his pretrial attorneys and determined that the petitioner failed to satisfy his burden of proving this claim. Notwithstanding, the trial court found that the petitioner's pretrial attorneys were aware of Jeff Hall's existence, including the fact that he was dying from AIDS. While the trial court agreed with the petitioner that his pretrial attorneys should have preserved Jeff Hall's testimony out of caution, the trial court found that the petitioner had failed to demonstrate any prejudice. The trial court additionally found that trial counsel did attempt to introduce the statement during the trial but that it was ruled inadmissible.

The petitioner claimed that trial counsel failed to present a sufficient mitigation defense during the penalty phase of the trial. The trial court reviewed the evidence presented during the penalty phase, recounting the testimony of the seven witnesses called by trial counsel, and rejected the petitioner's claim, finding that trial counsel portrayed the petitioner in the most positive light possible under the circumstances. The trial court determined that the post-conviction testimony was essentially the same as the testimony introduced at the trial. While acknowledging that the petitioner's sisters testified more during the post-conviction hearing, the trial court determined that it had no bearing on the merits of his ineffective counsel claim, noting that "more is not always better." The trial court determined that nothing in the testimony of Martin Eskew would have benefitted the petitioner. The trial court concluded that it was a reasonable strategic decision not to present the testimony of either Jackie or Darlene Brittain, as any benefit of their testimony would have been outweighed by the state's cross-examination of either of these witnesses regarding their statements to the TBI. Regarding the testimony of the Foremans and the Stanfills, the trial court determined that it would have added little to the testimony already presented during the penalty phase. Finally, the trial court indicated that the petitioner did not establish that trial counsel was deficient for failing to interview witnesses personally.

**Post-Conviction Standard of Review**

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103. The petitioner's challenge to his conviction and sentence for first degree murder is governed by the 1995 Post-Conviction Act, which requires that allegations be proven by clear and convincing evidence. See T.C.A. § 40-30-110(f). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

26

Once the trial court has ruled upon a petition, its findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Wallace v. State, 121 S.W.3d 652, 656 (Tenn. 2003); State v. Nichols, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). This court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. Nichols, 90 S.W.3d at 586. Questions concerning the credibility of witnesses and the weight to be given their testimony are for resolution by the post-conviction court. Id. (citing Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997)). Notwithstanding, determinations of whether counsel provided a defendant constitutionally effective assistance present mixed questions of law and fact. Wallace, 121 S.W.3d at 656; Nichols, 90 S.W.3d at 586. As such, our review is de novo, and we accord the conclusions reached below no presumption of correctness. Wallace, 121 S.W.3d at 656, Nichols, 90 S.W.3d at 586.

## I. INEFFECTIVE ASSISTANCE OF COUNSEL

The Sixth Amendment provides, in pertinent part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right to counsel is "so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the States by the Fourteenth Amendment." Gideon v. Wainwright, 372 U.S. 335, 340, 83 S. Ct. 792 (1963) (quoting Betts v. Brady, 316 U.S. 455, 465, 62 S. Ct. 1252 (1942)). Inherent in the right to counsel is the right to effective assistance of counsel. Cuyler v. Sullivan, 446 U.S. 335, 344, 100 S. Ct. 1708 (1980); McMann v. Richardson, 397 U.S. 759, 771 n.14, 90 S. Ct. 1441 (1970); see also Strickland v. Washington, 466 U.S. 668, 686, 104 S. Ct. 2052 (1984).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686, 104 S. Ct. at 2064; Combs v. Coyle, 205 F.3d 269, 277 (6th Cir. 2000). A two-prong test directs a court's evaluation of a claim of ineffectiveness:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. The Strickland standard applies, as well, to the right to counsel under article I, section 9 of the Tennessee Constitution. See State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

The performance prong of the Strickland test requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness, or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S. Ct. at 2066; see also Kimmelman v. Morrison, 477 U.S. 365, 386, 106 S. Ct. 2574 (1986). "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Combs, 205 F.3d at 278. Upon reviewing claims of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. Additionally, courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Finally, we note that criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794, 107 S. Ct. 3114, 3126 (1987). Notwithstanding, we recognize that "[o]ur duty to search for constitutional [deficiencies] with painstaking care is never more exacting than it is in a capital case." Id. at 785, 107 S. Ct. at 3121.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. In evaluating whether a petitioner satisfies the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372, 113 S. Ct. 838 (1993) (citing Strickland, 466 U.S. at 687, 104 S. Ct. at 2064). In other words, a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the defendant of a fair trial and called into question the reliability of the outcome. Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002). That is, the evidence stemming from the failure to prepare a sound defense or to present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in an acquittal. Code v. Montgomery, 799 F.2d 1481, 1483 (11th Cir. 1986); Nealy v. Cabana, 764 F.2d 1173, 1178-79 (5th Cir. 1985). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in Strickland." State v. Zimmerman, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991); see also Chambers v. Armontrout, 907 F.2d 825, 832 (8th Cir. 1990), cert. denied, 498 U.S. 950, 111 S. Ct. 369 (1990). Moreover, when challenging a death sentence, the petitioner must show that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." Henley v. State, 960 S.W.2d 572, 579-80 (Tenn. 1997), reh'g denied, (1998), cert. denied, No. 97-

8880 (U.S. Tenn. Oct. 5, 1998) (citing <u>Strickland v. Washington</u>, 466 U.S. at 695, 104 S. Ct. at 2069).

## II. CLAIMS BEFORE THIS COURT

On appeal, the petitioner claims that his trial counsel failed to function as effective counsel as guaranteed by both the Tennessee and United States Constitutions. In this regard, he asserts that they denied him the effective assistance of counsel at both the guilt and penalty phase of his trial by failing to meet these standards for capital representation:

(1) trial counsel failed to present an intoxication defense properly;
(2) trial counsel failed to establish the victim as the aggressor;
(3) trial counsel failed to preserve the testimony of Jeff Hall;
(4) trial counsel failed to present evidence of the petitioner's habit of disconnecting telephone lines;
(5) trial counsel failed to present the mental health issue properly;
(6) trial counsel failed to present evidence that the petitioner was a good father and evidence of other good acts of the petitioner;
(7) trial counsel failed to develop a defense strategy; and
(8) trial counsel failed to interview all potential witnesses.

We proceed to review each of the petitioner's arguments and analyze them in light of trial counsel's conduct and performance. We note that the petitioner has failed to assign counsel's alleged deficiencies to either the guilt or the penalty phase. As did the trial court, we will review the errors in appropriate context at either the guilt phase, penalty phase, or both.

### A. Counsel failed to present an intoxication defense properly

The petitioner contends that trial counsel failed to present evidence of intoxication properly to negate his ability to form the requisite intent to establish premeditation. He complains that trial counsel "failed to produce one shred of evidence regarding intoxication." In this regard, the petitioner contends that trial counsel was ineffective for failing to locate and present the testimony of Diana Pearson and Alice Pearson. At the post-conviction hearing, the petitioner presented their testimony. Both said that they were at a bar on July 29, 1994, and that they could barely recall having drinks with the petitioner.

Mr. Ford testified that intoxication, while not a defense to murder, was a part of their defense theory. He said that he was unsuccessful in his attempt to locate witnesses who knew of the petitioner's alcohol problem. Moreover, the petitioner refused to testify. Mr. Ford stated that the defense was unable to pursue this avenue at trial based on these factors.

The trial transcript reveals that evidence of intoxication was presented through the testimony of several witnesses:

29

1. On cross-examination, Chris Dutton acknowledged telling the authorities that the petitioner had stated that he had started drinking after he spoke with the victim on the telephone on the day of the murder and that he was drunk at the time of the incident.

2. On cross-examination, one of the petitioner's daughters, Cynthia Lambert, admitted that he had brought beer with him to the victim's home and that he started drinking one of the beers in her presence.

3. Dr. Lynn Zager, a defense witness, testified to the petitioner's alcohol dependence problem and that, at the time of the incident, he was intoxicated on alcohol. On cross-examination, Dr. Zager stated that her information as to the petitioner's intoxication at the time of the offense was not based solely upon the petitioner's self-report, but also on interviews of persons with the petitioner "shortly before the incident" that were conducted by Mike Mosier, previous counsel for the petitioner.

Additionally, Dr. Zager relied upon information provided by the petitioner's family regarding his alcohol problem.

We conclude, as did the trial court, that the trial transcript directly refutes the petitioner's claim that trial counsel failed to present any evidence of intoxication. Moreover, we cannot conclude that counsel was deficient for failing to present the testimony of either Alice or Diana Pearson. Neither witness could testify regarding the amount of alcohol consumed by the petitioner. Neither witness could testify as to whether the petitioner appeared intoxicated. Indeed, both witnesses could barely remember sharing drinks with him at all. The petitioner has failed to establish how the testimony of these witnesses was relevant to a theory of intoxication, and he has failed to establish either deficient performance or resulting prejudice.

Additionally, while the petitioner could have testified as to the level of his intoxication before the murder, the petitioner decided not to testify. Counsel cannot be found ineffective for the petitioner's decision not to testify. The petitioner is not entitled to relief on this claim.

### B. Counsel failed to establish the victim as the aggressor

The petitioner asserts that the post-conviction testimony of his siblings "and the Brittains clearly establish that the victim was capable of goading the petitioner." He contends that this evidence established provocation and was essential to establish the circumstances for voluntary manslaughter. Trial counsel testified that they made a strategic decision not to attack the character of the victim because it ran the risk of alienating the jury. Mr. Mayo also said that as best as he could recall, the victim's acts against the petitioner were not severe enough to imply that his conduct was reasonable. Both Mr. Mayo and Mr. Ford stated that the petitioner was the only reliable source to establish the victim's acts of violence but that he refused to testify.

Briefly summarized, the facts established that the petitioner disconnected the telephone lines, forced his way into the victim's home, and violently attacked her as the children jumped on his back, bit him, and pleaded for him to stop hurting their mother. The fight continued outside, where the petitioner dragged the victim across the driveway and to the back of the house. There, he held her under the water in the children's swimming pool. No evidence showed that the victim provoked the petitioner immediately before his actions that resulted in her death. The trial court concluded that in light of these facts, evidence of the victim's prior acts of aggression upon the petitioner would not have assisted counsel in establishing that the victim was the first aggressor on this occasion. Additionally, the trial court found that the testimony of Dr. Zager and Randy Helms communicated to the jury that the petitioner was emotionally distraught and acting in an impulsive manner.

During the petitioner's trial, counsel attempted to negate the element of premeditation by presenting evidence of mental health issues and intoxication rather than attempt to establish the provocation necessary to support a voluntary manslaughter verdict. The state possessed a sufficient amount of information reflecting prior acts of violence by the petitioner against the victim, but did not seek introduction of this evidence at trial. However, had the defense attempted to establish the victim as the first aggressor, the state could have presented such information to discredit any indication that the victim provoked the petitioner. The defense strategy not to portray the victim as the aggressor was reasonable, given the risk of the backlash from attacking the deceased victim's character. See, e.g., Heiman v. State, 923 S.W.2d 622, 627 (Tex. Crim. App. 1995) (stating it was sound trial strategy to refrain from attacking the victim's character as it was conceivable that the jury would have found this strategy repugnant). Accordingly, the petitioner has failed to establish that counsel was deficient by failing to pursue this theory of defense. He is not entitled to relief as to this claim.

### C. Trial counsel failed to preserve the testimony of Jeff Hall

The petitioner's brother, Jeff Hall, died from complications of AIDS on July 4, 1995. The petitioner claims that trial counsel were ineffective for failing to preserve his testimony. It is undisputed that Mr. Ford and Mr. Mayo were not counsel of record at the time of Jeff Hall's death. The record reflects that during the guilt phase of the trial, counsel attempted to introduce the affidavit through the testimony of Sheryl Arbogast. See Hall, 8 S.W.3d at 603. The trial court excluded the testimony because Ms. Arbogast had no personal knowledge of the facts regarding her brother's mental state. The issue was raised on direct appeal. Both this court and the Tennessee Supreme Court affirmed the trial court's exclusion of this statement. In affirming the trial court's exclusion of the statement, our supreme court reasoned:

> Rule 804 provides for certain exceptions to the hearsay exclusionary rule when a witness is "unavailable." "Unavailability" is defined at subsection (a)(4) as including situations in which the declarant "[i]s unable to be present or to testify at the hearing because of the declarant's death or then existing physical or mental illness or infirmity." However, under subsection (b) of Rule 804, the hearsay

31

> exception for unavailable witnesses applies only to (1) former testimony, (2) statements under belief of impending death, (3) statements against interest, and (4) statements of personal and family history. See Tenn. R. Evid. 804(b). Jeff Hall's descriptions to Arbogast of the defendant's mental state do not fall within any of these exceptions.

Id. Mr. Ford and Mr. Mayo were not deficient in failing to secure introduction of Jeff Hall's testimony.

Notwithstanding, the issue arises as to whether pretrial counsel were ineffective for failing to interview or preserve the testimony of Jeff Hall. Before his death, Sheryl Abrogast traveled to Texas and obtained an affidavit from him. In the affidavit, he said that the petitioner had visited him in June 1994. During this visit, he observed that the petitioner was "very depressed/suicidal over family and money problems." The affidavit reflects Mr. Hall's belief that the petitioner loved his wife and children. He also believed that if his brother was guilty of murder, the murder was "invoked and induced by someone." He said that "Jon acted under strong provocation, stress, pressure, and seemed to be dysfunctional during his visit with me . . . ." Mr. Hall closed by stating that his brother's attorneys had never contacted him about testifying as a character witness.

The petitioner failed to call his former attorneys as witnesses during the post-conviction evidentiary hearing. As such, he has failed to satisfy his burden of proving his allegation by clear and convincing evidence. Neither the trial court nor this court have any way of knowing the circumstances relevant to the issue and former counsel or whether a tactical reason existed to withhold this information from the jury absent testimony from pretrial counsel. The petitioner is not entitled to relief on this claim.

D. Trial counsel failed to present evidence of the petitioner's habit of disconnecting telephone wires

At the post-conviction hearing, the petitioner maintained that the act of disconnecting telephone lines, by itself, appeared sinister. He presented testimony that it was common for him to disconnect telephone lines in order to obtain the undivided attention of the person he was confronting. The petitioner maintained that none of the prior incidents where he disconnected telephone lines resulted in him inflicting harm. His position at the post-conviction hearing was that introduction of these prior incidents would have taken away the "sting" of the wires being disconnected and would have negated premeditation. He maintains that trial counsel were ineffective for failing to introduce evidence establishing that it was the petitioner's habit to disconnect telephone lines.

At the post-conviction hearing, trial counsel disagreed with the petitioner's theory on his habit of disconnecting telephone lines. Mr. Mayo testified that the act of disconnecting telephone lines to a house, no matter for what purpose, "paints a picture of someone who is on the edge." While he agreed that the act of disconnecting the wires appeared sinister, he believed that it looked

sinister whether or not someone was harmed. He said that he could not conclude that this information would have been helpful to the petitioner. Mr. Ford testified that counsel was aware of the petitioner's practice of disconnecting telephone lines because it was contained in Carroll County police reports. Mr. Ford testified that evidence of a habit of disconnecting telephone lines established that the petitioner wanted to control situations and planned to do the same again. He disagreed with the position that this evidence would have negated premeditation.

The trial transcript reflects that during cross-examination of Chris Dutton, trial counsel elicited the fact that the petitioner had explained that he had disconnected the telephone line on previous occasions to prevent the victim from calling the police. See Hall, 8 S.W.3d at 598. Thus, information was conveyed to the jury that the petitioner had previously disconnected telephone lines with no harm resulting to the person he was confronting. We conclude, as did the trial court, that trial counsel was not deficient for failing to introduce multiple instances showing the petitioner's habit of disconnecting telephone lines. See Hellard, 629 S.W.2d at 9. The petitioner is not entitled to relief on this claim.

### E. Trial counsel failed to present the mental health issue properly

### 1. Factual background underlying claim

During the guilt phase of the petitioner's trial, trial counsel presented the testimony of Dr. Lynn Zager, a clinical psychologist. See Hall, 8 S.W.3d at 598. Dr. Zager diagnosed the petitioner as depressed and suffering from alcohol dependence. She further observed "personality characteristics of paranoia and dependency." In her professional opinion, she believed that the petitioner suffered from depression and alcohol intoxication at the time of the killing. She found these factors were compounded by his personality characteristics and various psycho-social stressors, including a sick child, loss of employment with the resulting financial problems, his impending divorce, and the terminal illness of a brother. She concluded that the petitioner acted in an impulsive manner in killing his wife, rather than pursuant to a preconceived plan.

Dr. Zager testified again during the penalty phase along with Dr. Joe Mount, a psychological examiner who counseled the petitioner at Riverbend Maximum Security Institution. Hall, 8 S.W.3d at 598. Both doctors described him as "depressed, remorseful, suicidal and extremely concerned about his children." Dr. Mount testified that the petitioner had been diagnosed as suffering from an adjustment disorder with mixed emotional features and "substance abuse of dependence by history." Id. at 599.

At the post-conviction evidentiary hearing, the petitioner presented the testimony of Dr. Pamela Auble and Dr. Keith Caruso, who examined the petitioner at the request of post-conviction counsel. Both doctors testified that a complete social history, including interviews with more than one family member, was necessary in order to competently evaluate a client.

33

Dr. Auble's evaluation of the petitioner resulted in several conclusions: (1) certain results were consistent with attention deficit disorder, (2) results indicated the petitioner has difficulty controlling emotions in emotional situations, (3) the petitioner exhibited low self-esteem, (4) evidence of internal anger existed, (5) the petitioner may have had trouble understanding people and perceiving them in accurate ways, and (6) evidence existed of tension from his current situation. Dr. Auble stated that a low serotonin level would be consistent with Intermittent Explosive Disorder. On cross-examination, Dr. Auble conceded that a diagnosis of Intermittent Explosive Disorder is made only after other mental disorders and alcohol or drug abuse are excluded. Alcohol abuse, drug abuse, and other mental disorders could not be excluded as the cause of the petitioner's aggressive behavior. She conceded that her conclusions were basically the same as those reached by Dr. Zager.

Dr. Caruso concluded that because of Intermittent Explosive Disorder, major depression, and intoxication, but mostly Intermittent Explosive Disorder the petitioner was unable to achieve a mental state absent of passion and excitement. He said that recent research by Dr. Emil Coccaro revealed a correlation between low levels of serotonin in the brain and violent acts. He stated that the petitioner's serotonin level is in the bottom five percent and is, therefore, consistent with someone having Intermittent Explosive Disorder. On cross-examination, Dr. Caruso conceded that Dr. Coccaro's findings relative to serotonin level and Intermittent Explosive Disorder were neither available in 1995 nor at the time of the trial because Dr. Coccaro's theory was not presented until 2001. He further conceded that this information is not contained in the current DSM4. Dr. Caruso agreed that the petitioner's act of disconnecting the telephone line established that he was capable of some degree of planning.

The state presented the testimony of Dr. Kimberly Stalford to rebut the conclusions of Dr. Auble and Dr. Caruso. Dr. Stalford defined Intermittent Explosive Disorder and stated that she did not diagnose the petitioner as having the disorder. She concluded that the petitioner's behavior was better explained with a diagnosis of passive/aggressive traits, dependant traits, and anti-social traits, including a reckless disregard for other people and agitated and potentially violent acts. She also diagnosed the petitioner with alcohol dependence.

Dr. Stalford discounted the correlation between low serotonin levels and Intermittent Explosive Disorder. Specifically, she said that a low serotonin level is not a useful diagnostic tool for three reasons: (1) many medical, neurological, and psychiatric conditions have been linked to altered serotoninergic levels so as to rebut the assertion that a low level of serotonin is undoubtedly linked only to Intermittent Explosive Disorder; (2) serotonin levels measured in the spinal fluid are not an accurate indication of the serotonin activity in the synapses which is where it works; and (3) much question exists as to what are "normal" levels of serotonin.

The petitioner contends that trial counsel was ineffective for failing to provide Dr. Zager with a complete mitigation history of the petitioner, which prohibited a complete evaluation of the petitioner's mental condition. Additionally, he asserts that counsel was ineffective for relying upon the evaluation of Dr. Zager, a psychologist, rather than obtaining the services of a psychiatrist.

## 2. Failure to provide complete mitigation history

In his brief, the petitioner makes several statements regarding counsel's "duty to investigate thoroughly a complete mitigation history of the client." However, he fails to allege which portions of his social history were not provided to Dr. Zager. At the post-conviction hearing, three of the petitioner's sisters and several of his friends testified that trial counsel failed to interview them until the evening before their testimony. It was established, however, that the petitioner had been appointed investigators by the court. The petitioner did not present the testimony of these investigators or his pretrial attorneys at the post-conviction hearing.

The mitigation assessments and reports provided by Dr. Ann Charvat and Gloria Shettles were introduced as part of the post-conviction record. Dr. Charvat's assessment contained summaries of her interviews with Sheryl Arbogast and the petitioner's mother. Dr. Charvat compiled a lengthy family history and her report also contained a list of potential witnesses and detailed guidance for the manner in which defense counsel should prepare for a capital murder trial. Additionally, the post-conviction record contains one memorandum completed by Gloria Shettles, the mitigation specialist, showing that both the petitioner and Sheryl Arbogast had reviewed and made corrections to Dr. Charvat's initial assessment. The memorandum also indicates that correspondence had been forwarded to the petitioner's family for the purpose of separate interviews and additional background information. The memorandum reflects Gloria Shettles' conclusion that the petitioner may have suffered from Intermittent Explosive Disorder. The petitioner failed to present the testimony of Ms. Shettles and failed to provide the court with additional reports. The petitioner has not established that Ms. Shettles did not interview potential witnesses. Finally, there is evidence that defense counsel was granted funds for a private investigator, Tammy Askew. There is no evidence before the court that Ms. Askew did or did not conduct any investigation.

Trial counsel testified that Dr. Zager was provided all of the relevant information that they possessed. The record does contain a letter written on November 19, 1995, by Dr. Zager to one of the petitioner's pretrial attorneys, which stated her need for more information before she would be able to deliver a definitive assessment of the petitioner. Specifically, she inquired as to interviews with Randy Helms, Jackie and Darlene Brittain, the petitioner's mother, Debbie Davis, Sheryl Arbogast, and Jeff Hall. The letter closed by stating, "I will provide a complete report once the above information is received and reviewed in light of the evaluation." The petitioner failed to call Dr. Zager as a witness at the post-conviction hearing. We can presume from the fact that she testified as to the petitioner's mental condition at trial that she was provided sufficient information for a complete report. The petitioner has failed to establish that Dr. Zager was not provided all relevant information. Counsel cannot be found deficient when they complete an adequate investigation.

## 3. Failure to obtain services of a psychiatrist

The petitioner complains that trial counsel were ineffective for failing to seek the services of a psychiatrist. The petitioner was provided the services of Dr. Zager, a clinical psychologist. The

evidence does not indicate whether Dr. Zager had Gloria Shettles' report mentioning Intermittent Explosive Disorder available to her. Evidence at the post-conviction hearing reflected that Ms. Shettles discussed the possibility of the petitioner's suffering from Intermittent Explosive Disorder with Sheryl Arbogast. Ms. Arbogast apparently agreed with Ms. Shettles' assessment. However, neither Ms. Shettles nor Ms. Arbogast were qualified to provide a diagnosis as to the petitioner's mental condition, and Dr. Zager was not bound to adopt their opinions. Dr. Zager's qualifications as a clinical psychologist are not disputed, and there is noting indicating that Dr. Zager's diagnosis would have changed had she been provided additional information. Accordingly, we believe that the only complaint concerning Dr. Zager's diagnosis is that it is not the diagnosis now desired by the petitioner. In effect, the petitioner is contending that trial counsel were deficient for failing to present evidence of Intermittent Explosive Disorder.

Nothing in the record indicates that Dr. Zager did not consider the possibility that the petitioner suffered from Intermittent Explosive Disorder. Additionally, had Dr. Zager believed that a serotonin test was necessary, she could have informed trial counsel that she did not have the authority to order such a test and that a psychiatrist should be contacted to conduct further evaluations. Dr. Zager did not make any such indication to trial counsel. Additionally, the petitioner has failed to present any evidence establishing that trial counsel should not have relied upon Dr. Zager's professional opinion.

Dr. Zager did not diagnose the petitioner with Intermittent Explosive Disorder. The Middle Tennessee Mental Health Institute team, which included a psychiatrist, did not diagnose the petitioner with Intermittent Explosive Disorder. Finally, the state's post-conviction psychiatrist did not diagnose the petitioner with the disorder. Thus, the petitioner's claim, at best, amounts to an assertion that counsel should have obtained an expert who would have diagnosed the petitioner with Intermittent Explosive Disorder. The Constitution does not require attorneys to "shop around" for more favorable expert testimony. See Poyner v. Murray, 964 F.2d 1404, 1419 (4th Cir. 1992).

Although the petitioner has now presented the testimony of two experts to support his theory of Intermittent Explosive Disorder, he still has not established that counsel was deficient for failing to present such testimony at trial. Dr. Caruso conceded that research relative to the correlation of low serotonin levels and Intermittent Explosive Disorder was unavailable at the time of the petitioner's trial. Additionally, the trial court determined that the testimony of both Dr. Auble and Dr. Caruso was effectively impeached through cross-examination of these witnesses and by the testimony of Dr. Stalford. The petitioner has failed to establish that trial counsel should have presented evidence of Intermittent Explosive Disorder. He is not entitled to relief on this claim.

### F. Trial counsel failed to present evidence that the petitioner was a good father and evidence of other good acts of the petitioner

The petitioner asserts that he has presented "massive amounts of 'good guy' and 'good father' evidence" during the post-conviction evidentiary hearing. The record reflects that he presented the testimony of (1) Sheryl Arbogast and Kathy Hugo, the petitioner's sisters, who could

have testified to his aptitude as a father, (2) Clarence Stanfill, Joe Henry Stanfill, Valene Foreman, Paula Foreman, and Pamela Foreman who could have testified to the petitioner's ability to care for his children, and (3) Jackie and Darlene Brittain who could have testified to good acts performed by the petitioner. He contends that trial counsel were deficient for failing to investigate and interview favorable witnesses and for failing to introduce their testimony at trial.

In the context of capital cases, a defendant's background, character, and mental condition are unquestionably significant. "[E]vidence about the defendant's background and character is relevant because of the belief . . . that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." California v. Brown, 479 U.S. 538, 545, 107 S. Ct. 837, 841 (1987); see Eddings v. Oklahoma, 455 U.S. 104, 113-15, 102 S. Ct. 869, 876-77 (1982); Lockett v. Ohio, 438 U.S. 586, 604-05, 98 S. Ct. 2954 (1978) (plurality opinion); Zagorski v. State, 983 S.W.2d 654, 657-58 (Tenn. 1998); Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996). The right that capital defendants have to present a vast array of personal information in mitigation at the sentencing phase, however, is constitutionally distinct from the question whether counsel's choice of information to present to the jury was professionally reasonable.

There is no constitutional imperative that counsel must offer mitigation evidence at the penalty phase of a capital trial. Nonetheless, the basic concerns of counsel during a capital sentencing proceeding are to neutralize the aggravating circumstances advanced by the state and to present mitigating evidence on behalf of the defendant. Although there is no requirement to present mitigating evidence, counsel does have the duty to investigate and prepare for both the guilt and the penalty phase. See Goad, 938 S.W.2d at 369-370.

To determine whether trial counsel was ineffective for failing to present mitigating evidence, the reviewing court must consider several factors. First, the reviewing court must analyze the nature and extent of the mitigating evidence that was available but not presented. Goad, 938 S.W.2d at 371 (citing Deutscher v. Whitley, 946 F.2d 1443 (9th Cir. 1991); Stephens v. Kemp, 846 F.2d 642 (11th Cir. 1988); State v. Adkins, 911 S.W.2d 334 (Tenn. Crim. App. 1994); Cooper v. State, 847 S.W.2d 521, 532 (Tenn. Crim. App. 1992)). Second, the court must determine whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings. Id. (citing Atkins v. Singletary, 965 F.2d 952 (11th Cir. 1992), cert. denied, 515 U.S. 1165, 115 S. Ct. 2624 (1995); Clozza v. Murray, 913 F.2d 1092 (4th Cir. 1990), cert. denied, 499 U.S. 913, 111 S. Ct. 1123 (1991); Melson, 722 S.W.2d at 421)). Third, the court must consider whether there was such strong evidence of applicable aggravating factors that the mitigating evidence would not have affected the jury's determination. Id. (citing Fitzgerald v. Thompson, 943 F.2d 463, 470 (4th Cir. 1991), cert. denied, 502 U.S. 1112, 112 S. Ct. 1219 (1992); Elledge v. Dugger, 823 F.2d 1439 (11th Cir. 1987), cert. denied, 485 U.S. 1014, 108 S. Ct. 1487 (1988)).

Trial counsel developed a mitigation theory that was supported by both expert and lay witnesses. During the penalty phase of the petitioner's trial, Dr. Zager testified that the petitioner's children "meant everything" to the petitioner. She stated that he was the children's primary caretaker

and that he was very protective of them. Dr. Zager recognized the relationship the petitioner shared with his daughter who suffered from cerebral palsy. Dr. Joe Mount testified that the petitioner was extremely concerned about his children. He expressed his opinion that the petitioner cared a great deal for his children. Dr. Mount also acknowledged the petitioner's concerns about his daughter who suffered from cerebral palsy. Randy Helms, the petitioner's former employer, described the petitioner as a good, dependable employee and conveyed how he had cared for his children. He affirmed the petitioner's love for his wife and children. The petitioner's sister, Debbie Davis, described him as "a wonderful person at home, very helpful. He would help anybody do anything." Ms. Davis testified that the petitioner "just adored the children," noting that "[h]e was a wonderful daddy. He was just absolutely wonderful." She stated, "He played with all of them. . . . He loved them equally. He loved them all." Finally, the petitioner's mother stated that he took care of his children and loved them all. She also related how the petitioner took special care of his daughter with cerebral palsy.

In addition to this testimony, defense counsel elicited favorable character information during cross-examination of several of the state's witnesses. Chris Dutton testified that the petitioner was concerned about his children, especially his daughter with cerebral palsy. During the examination of TBI Agent Byrd, defense counsel elicited testimony that the petitioner expressed remorse over causing his wife's death.

The petitioner presented seven witnesses during the penalty phase of the trial. Contrary to the petitioner's assertions, trial counsel did introduce evidence to rebut the state's portrayal of him as a "monster." At the post-conviction hearing, the petitioner maintained that trial counsel did not adequately explore potential mitigation witnesses and he presented numerous witnesses to demonstrate the type of mitigating evidence which he believed should have been presented during the penalty phase. These witnesses testified regarding their perceptions of the petitioner as a father and a person. These witnesses were cumulative and expounded upon testimony presented by the seven witnesses presented at the penalty phase. In this regard, we conclude that trial counsel identified and presented testimony supporting the relevant mitigating themes. The only question is whether trial counsel should have introduced more mitigating evidence. We cannot conclude that a reasonable probability exists that more testimony of this nature would have led the jury to conclude that the "balance of aggravating and mitigating circumstances did not warrant death." Nichols, 90 S.W.3d at 602.

Additionally, we conclude that trial counsel strategically elected not to present the testimony of several witnesses. With regard to the testimony of Jackie and Darlene Brittain, we agree with trial counsel's assessment that any valuable testimony that they could have provided for the petitioner was outweighed by the danger of the state cross-examining these witnesses as to prior threats made by the petitioner against the victim, including that he "was going to grind his wife up into hamburger meat." We also question the importance of several witnesses, i.e., Valene Foreman, Pamela Foreman, and Paula Foreman, who indicated from their testimony that they did not know the petitioner very well. Additionally, some of their testimony contradicted the petitioner's claim that

38

he always cared for the children when the victim was at work or at school. Again, the petitioner has failed to establish that counsel's performance was deficient.

Finally, with regard to the claims of post-conviction witnesses that trial counsel failed to contact them regarding their potential testimony, we again refer to the fact that the defense team consisted of three investigators. None of these investigators were called to testify at the post-conviction hearing. There is evidence that defense counsel was aware of these potential witnesses. For instance, Darlene Brittain testified that trial counsel informed her that they would not call her as a witness because of the petitioner's "hamburger" statement; Jackie Brittain stated that the state had subpoenaed him as a witness as he had provided information that the petitioner had made threats against the victim. He conceded that trial counsel had talked with him at the courthouse. The petitioner has failed to establish that he is entitled to relief on this claim.

### G. Trial counsel failed to present a theory of defense

The petitioner asserts that trial counsel failed to develop and present a theory of defense. Specifically, he complains that trial counsel failed to present evidence of intoxication, evidence that the murder was the result of a continuing domestic dispute, or any other evidence favorable to the petitioner. The petitioner's allegation is not supported by either the record of the post-conviction hearing or the record of the petitioner's trial. Mr. Ford testified that the defense relied upon a theory that the petitioner was acting in an impulsive manner. Trial counsel attempted to convince the jury that the petitioner was distraught, depressed, and intoxicated. Trial counsel argued that the petitioner's behavior reflected an impulsive act as opposed to a planned act. Counsel asserted that the state had failed to meet its burden of proving premeditation and deliberation beyond a reasonable doubt. During opening argument, trial counsel focused on the petitioner's domestic problems with the victim, suggested that the petitioner went to the victim's residence hoping for a reconciliation, and emphasized the fact that the petitioner did not take a weapon with him. Counsel supported this position throughout their examination of the witnesses. These theories continued throughout the penalty phase. The petitioner's claims are clearly not supported by the record. The petitioner has not presented any other evidence that the defense was not adequate. Therefore, the petitioner has not met the requirements to be granted post-conviction relief on this claim.

## III. WAIVED OR PREVIOUSLY DETERMINED ISSUES

The petitioner challenges the constitutionality of Tennessee's death penalty statutes, contending that (1) the heinous, atrocious, or cruel aggravating factor is unconstitutionally vague and overbroad; (2) the sentence of death cannot be fairly imposed and administered; and (3) the sentence of death unconstitutionally infringes upon the petitioner's right to life. The trial court rejected these claims, finding them previously determined, waived, or not supported with evidence. The trial court also determined that the claims raised by the petitioner have been rejected by Tennessee's appellate courts on numerous occasions. We agree on all points.

Waiver of a claim occurs when "the petitioner personally or through an attorney fail[s] to present [the claim] for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." T.C.A. § 40-30-106(g). A ground for relief is "previously determined" if a court of competent jurisdiction has ruled on the merits after a full and fair hearing." T.C.A. § 40-30-106(h).

On direct appeal, the petitioner challenged the constitutionality of the heinous, atrocious, or cruel aggravating circumstance. See State v. Jon Douglas Hall, No. 02C01-9703-CC-00095, Madison County (Tenn. Crim. App. Apr. 29, 1998), aff'd by, 8 S.W.3d 593. Accordingly, this claim has been previously determined.

Waiver is determined by an objective standard under which a petitioner is bound by the action or inaction of his attorney. House v. State, 911 S.W.2d 705, 714 (Tenn. 1995). Notwithstanding, the presumption that a ground not raised is waived is rebuttable. T.C.A. § 40-30-106(g). To rebut the presumption, the petition must contain "allegations of fact supporting each claim for relief set forth in the petition and allegations of fact explaining why each ground for relief was not previously presented in any earlier proceeding." T.C.A. § 40-30-104(e). In his amended petition for post-conviction relief, the petitioner alleged that appellate counsel was ineffective for failing to challenge the constitutionality of Tennessee's death penalty scheme on direct appeal. No evidence was presented at the post-conviction hearing regarding this claim. Thus, the trial court was precluded from finding anything other than waiver of these claims. Similarly, in his brief to this court, petitioner does not couch his challenges to the constitutionality of the death penalty scheme in terms of appellate counsel's failure to raise the issue on appeal. Again, we are precluded from reaching any result other than that finding that the petitioner has waived these issues by failing to present these claims in his prior proceeding before a court of competent jurisdiction. For these reasons, the petitioner is not entitled to relief on these claims.

## CONCLUSION

After a thorough review of the record and the law applicable to the issues raised, we conclude that the evidence does not preponderate against the trial court's factual findings and that the petitioner has not shown that he received the ineffective assistance of counsel or an unconstitutional sentence. In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, JUDGE